UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SV SPECIAL SITUATIONS MASTER FUND LTD. and 3V CAPITAL MASTER FUND, LTD., <br><br> Plaintiffs, <br><br> - against - <br><br><br> KNIGHT LIBERTAS LLC, KNIGHT LIBERTAS HOLDINGS LLC, LIBERTAS HOLDINGS LLC, LIBERTAS PARTNERS LLC, and GARY KATCHER, <br><br> Defendants/Third-Party Plaintiffs, <br><br> - against - <br><br> MARK A. FOCHT, SCOTT A. STAGG, and 3V CAPITAL MANAGEMENT LLC, <br><br> Third-Party Defendants. | Case No. 3:08cv1769 (SRU) <br><br><br><br><br> September 23, 2011 |

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO RECONSIDER A PORTION OF THE JULY 8, 2011 ORDER

Plaintiffs' *second* motion for reconsideration of the Court's July 8, 2011 order (the "Order") requiring SV Special Situations Master Fund Ltd. ("SV Master Fund") to place $4,124,542 in cash in an escrow account, which amount SV Master Fund concedes it wrongfully possesses and owes to Gary Katcher, offers no new arguments that the Court has not already considered and correctly rejected. Instead, it merely confirms that Plaintiffs' motion is yet another attempt to avoid liquidating any of SV Master Fund's substantial assets. In denying Plaintiffs' first motion for reconsideration, the Court correctly recognized that SV Master Fund's belated claim that it was "impossible" to comply with the Order was not

supportable or persuasive.  Indeed, Plaintiffs' second motion for reconsideration confirms that SV Master Fund possesses assets that are more than sufficient to satisfy the Order:  SV Master Fund submitted an unaudited financial statement that, although inexplicably omits substantial assets of SV Master Fund, nevertheless confirms that SV Master Fund has *at least* $23.7 million in assets that can be monetized to comply with the Order.  (*See* Dkt. No. 311-3.)  Despite this plain admission—and the fact that those assets presumably were acquired, in part, with the funds stolen from Mr. Katcher—Plaintiffs' second motion for reconsideration repeats the same already rejected claims that it is financially impossible for SV Master Fund to comply with the Order.  Plaintiffs' own exhibit disproves that claim, and Plaintiffs' contention that they cannot monetize any portion of the $23.7 million or otherwise marshal resources to comply with the Order is baseless and nonsensical.  Equity interests in private companies are bought and sold all the time.  What's more, SV Master Fund's substantial assets provide numerous alternatives to secure cash sufficient to comply with the Order.  The Court should again reject Plaintiffs' baseless excuse for failing to comply with the Order.[1]

Moreover, even absent SV Master Fund's admission that it owns assets sufficient to comply with the Order, the motion for reconsideration should be denied because it is merely Stagg's latest attempt to avoid court orders requiring him to surrender the more than

---

[1] Defendants complied with the portion of the Order requiring them to establish an escrow account in the amount of $8.9 million.  To timely comply with the Order, and the Court's specific direction that the escrow be funded *in cash* and not stock, Defendants grudgingly directed the sale of 1.1 million shares of Knight Capital Group common stock in adverse market conditions—indeed, just days after the stock closed at its five-year low—and deposited the proceeds into an escrow account.  (*See* September 23, 2011 Declaration of Andrew P.C. Wright , Exh. A (hereinafter, citations in the form "Exh. __" refer to exhibits annexed to the Wright Declaration, filed in conjunction with this memorandum).)  Since that time, Knight's stock price has increased and Defendants, by timely complying with the Order, lost out on over $1.2 million.  The Court should enforce the same strict compliance with its Order against Plaintiffs and reject Plaintiffs' apparent claim that the Order should be reconsidered simply because compliance might cause SV Master Fund to monetize a portion of its equity interest at a discount or under the same adverse economic conditions in which Defendants were forced to act to comply with the Order.

$10 million he owes to Katcher. Over the past three years, numerous courts, including most recently this Court, have ordered Stagg and entities he controls collectively to hold, post, or pay Katcher $10 million, but Stagg has not complied with a single order. Rather, Stagg transfers assets between himself and entities he controls in an elaborate shell game. The game always ends with the same winner—Stagg claims he and his companies cannot comply with court orders, and they never do, but somehow he always finds money to finance his lavish personal expenses and fund his vendettas against Katcher. These issues were recently addressed in a contempt hearing in Connecticut Superior Court, where the evidence established Stagg's tactics and repeated violations of court orders. This Court should not endure Stagg's tactics and should uphold its Order requiring—just as other courts have required—SV Master Fund to liquidate a portion of its assets to ensure Katcher's almost-certain recovery of the funds Stagg stole four years ago. The second motion to reconsider should be denied with prejudice.

## ARGUMENT

### POINT I

### THE REQUESTED RELIEF IS UNWARRANTED DUE TO STAGG'S PATTERN OF TRANSFERRING MONEY TO AVOID COURT ORDERS

Plaintiffs' second request for relief from the Order continues Stagg's pattern of falsely claiming personal and corporate poverty to justify his refusal to comply with court orders. Beginning in 2008, the state courts of Connecticut and New York, and now this Court, collectively have ordered or adjudged Stagg and companies he owns or controls (including SV

Master Fund) to set aside and/or repay Mr. Katcher more than $10 million.[2] Stagg has not complied with any of those orders. Rather, just as he does here, Stagg transfers assets between his various companies in a complex shell game and then claims that he and his companies lack the ability to comply with court orders. This shell game is a mirage and the end result is always the same: with Stagg effectively thumbing his nose at the courts. But whenever Stagg needs money—to pay for his multi-million mansion, his brand new car, the legal and professional fees to pursue litigation he hopes will result in a windfall, or to defend against Katcher's attempt to recover the $10 million owed to him, for example—it always somehow appears. All of this is funded directly and indirectly by SV Master Fund.

These issues were recently litigated in a contempt hearing against Stagg and his companies in Connecticut state court for violating the two September 2008 TROs that required them to preserve assets for the benefit of Katcher (including Mr. Katcher's $4.1 million 3V Capital Partners LP capital account). The evidence presented at that hearing demonstrated that Stagg intentionally and repeatedly violated the TROs by transferring assets from the defendants and then claimed that the defendants could not satisfy any court orders. The evidence establishing Stagg's contemptuous conduct was immense, but three examples suffice to

---

[2] On September 4, 2008, the Connecticut Superior Court granted two temporary restraining orders requiring Stagg and his companies to "hold, preserve, and maintain inviolate, for Katcher's benefit" a total of $7,000,000 (the "TROs"). (Exh. B.) On or about July 7, 2010, after virtually the entire arbitration hearing on Katcher's claims underlying one of the TROs had been conducted, Stagg and his companies consented to a full $6,000,000 award in favor of Katcher. Judgments confirming that award were entered in the courts of New York and Connecticut in or about October and November 2010 (the "Judgment"). (Exh. C.) On February 1, 2011, the TRO in the other action was ripened into temporary injunctive relief and a prejudgment remedy was granted, which required Stagg, SV Master Fund, and other Stagg-owned entities to bring $4,124,543 into Connecticut for attachment and enjoined those entities from "using, reducing, diminishing, transferring, disposing of, and/or in any respect dissipating," and required them to hold and preserve, the $4,124,543 owed to Katcher. (Exh. D.)

demonstrate both (a) Stagg's apparent belief that he can flaunt court orders by concealing assets without consequence, and (b) that the motion for reconsideration should be denied.[3]

*First*, Stagg continues to use SV Master Fund's funds (*i.e.*, investor money) to fund his lifestyle and pay his personal expenses through a holding company SV Master Fund owns known as Mas Global Solutions Inc. ("Mas Global"). Mas Global, and its wholly-owned subsidiary Aurora Financial Systems, Inc. ("Aurora"), have no revenues and are funded entirely by SV Master Fund. (Exh. L, at 33:21-23, 38:25-39:17.) Despite telling SV investors that as of January 1, 2010 he was no longer receiving any management fees or payments from SV Master Fund, in 2010, Stagg directed Aurora and Mas Global to pay him almost $300,000 in salary and "consulting fees." (*See* Exh. E, at 13 at ¶ 34, 16-17 at ¶ 46, 21-22 at ¶ 62; Exh. H at 344:12-22.)[4] Even more deceptive, after Stagg consented to the $6 million personal Judgment in favor of Katcher (and Katcher was entitled to begin enforcing it), Stagg directed Aurora and Mas Global to make the payments to his wife's account, rather than his own, so that they would be shielded from Katcher's efforts to enforce the Judgment. (*See*

---

[3] Plaintiff's and defendants' proposed findings of fact and conclusions of law from the contempt hearing are attached to the Wright Declaration at Exhs. E and G, respectively, and the transcripts from the contempt hearing are attached as Exh. F. In addition to the examples described in this memorandum, plaintiff's proposed findings of fact and conclusions of law set forth the evidence showing that, in violation of the TROs and to render himself and his companies technically insolvent, Stagg transferred substantial assets, including emptying all his personal bank accounts on the very day Katcher was entitled to begin enforcing the $6,000,000 Judgment (*see* Exh. E, at 7-9); taking over $30,000 in ATM cash withdrawals from 3V Capital Management LLC's bank account between 2008 and 2010 (*see id.* at 20); causing Stagg Capital Group to pay thousands in his personal credit card charges and then lying about the charges under oath (*see id.* at 23-26); and transferring almost $400,000 from Stagg Capital Group to his personal account in December 2009 (*see id.* at 21).

[4] Stagg suspended investor redemptions from SV Master Fund in or about October 2008. (Exh. H, at 74:04-12.) Since that time, Stagg's control over SV Master Fund has been unchecked—he has not calculated SV Master Fund's net asset value, retained an administrator for SV Master Fund, or provided any regular financial statements to investors. (*Id.*)

Exh. D, at 21-22 at ¶¶ 62-64.)[5] Worse, in violation of court-issued restraining notices issued to aid in the enforcement of the Judgment, in February 2011 (immediately following a deposition in which Stagg testified he had no job, earned no salary, and had no bank accounts), Stagg secretly opened a new bank account, received a lump sum payment from Aurora and/or Mas Global purportedly for salary from January and February 2011, immediately withdrew all the funds, and closed the account. (*See* Exh. D, at 9-10, ¶¶ 19-20, 21-22 at ¶ 62.) And as if the salary were not enough, Stagg also pays his personal credit card expenses with the funds SV Master Fund funnels to Mas Global.[6]

*Second*, after the TROs were ordered and at the same time he was siphoning SV Master Fund's money through Mas Global (but deceptively telling investors that he no longer took any fees), Stagg also transferred over $115,000 from SV Master Fund to his personal account, through Stagg Capital Group. On January 22, 2010, Stagg transferred $50,000 from an SV Master Fund account into an account owned by another Stagg-controlled company, Stagg Capital Group; on February 12, 2010, Stagg transferred $43,000 of the $50,000 from the Stagg Capital Group account into his personal account. (*See* Exh. E, at 16 at ¶ 44.) Likewise, on May 27, 2010, Stagg transferred $73,818.04 from an SV Master Fund account into an account owned by Stagg Capital Group; one day later, Stagg transferred $72,042.79 of

---

[5] Contrary to Stagg's claim, his wife's receipt of his former salary from Aurora is a sham. Mrs. Stagg has no college degree, no discernible business experience, no experience in Aurora's industry, and did not even have a job in the thirteen years prior to receiving a $150,000 salary from Aurora. (*See* Exh. E, at 22-23 at ¶ 64.) Indeed, during the contempt hearing, Mrs. Stagg "drew a blank" on multiple occasions when asked what work she performed for Aurora. (*Id.*)

[6] Evidence produced during Katcher's pursuit of assets to satisfy the $6 million Judgment establishes that in 2010 Stagg caused Mas Global to pay at least $20,000 of his personal expenses and credit card bills. (*See* Exh. I at 50:06-92:10 (Scott Stagg February 3, 2011 deposition transcript) (testifying that Mas Global paid almost $20,000 in credit card charges he made on 3VCapital Management LLC's credit cards in November and December 2010 (i.e., after it was dissolved), including charges for gas, weekend restaurant and bar bills, a purchase of a mattress, couch, and dresser, and weekend ice cream).)

the $73,818.04 from the Stagg Capital Group account into his personal account and immediately closed the Stagg Capital Group account. (*See* Exh. E, at 16 at ¶ 45.) Again, not only were these transfers made in brazened violation of the court orders, but they improperly siphoned funds from SV Master Fund that otherwise would be available to comply with the Order.[7]

*Third*, after consenting to the $6 million Judgment, Stagg fraudulently transferred millions of dollars of his own assets to shield those assets from Katcher's efforts to enforce the Judgment. Between January 2007 and April 2008, in lieu of receiving taxable management fees, Stagg directed 3V Capital Fund Ltd. and 3V Capital Management LLC to "loan" him at least $10.3 million in numerous untaxed transactions, which proceeds Stagg used to acquire substantial assets. (*See* Exh. E, at 26-27 at ¶¶ 74-75.) On July 1, 2010, prior to consenting to the $6 million Judgment in favor of Katcher, Stagg testified under oath that he had not transferred any assets to repay the loans and they remained outstanding and unpaid. (*See* Exh. E, at 28 at ¶ 77.) But as soon as Katcher began efforts to enforce the judgment, Stagg changed his story and claimed that he had "repaid" the loans in May 2008 by transferring all the assets—thus putting those assets beyond Katcher's reach. (*Id.*)[8]

---

[7] Stagg falsely claimed that the transfers to his personal account were the payment of management fees. (*See* Exh. E, at 16-18 at ¶¶ 46-50.) As described above, Stagg Capital Group stopped earning fees and operating on or about December 31, 2009. (*See supra* n. 4.) Moreover, Stagg could not produce any evidence showing the purported management fee calculation and Stagg Capital Group's books and records recorded the transfers as "loan payable" or repayment of "loans," not payments of management fees. (*See* Exh. E, at 17-18 at ¶¶ 47-50.)

[8] Prior to changing his story, Stagg admitted that he never told anyone that he had transferred any assets to repay the loans (including his accountants). (*See* Exh. E, at 28 at ¶ 77.) Moreover, Stagg admitted that no one other than he (i) participated in preparing the only documents he could provide that purport to memorialize the loans and repayments, (ii) signed the documents, (iii) saw the documents, or (iv) knew they existed prior to the contempt hearing. (*See* Exh. E, at 28 at ¶ 78.) In fact, the only document signed by anyone other than Stagg is conveniently back-dated "as of" January 7, 2010. (*Id.*) Further, more credible evidence contradicts Stagg's repayment story, including records showing that after May 2008 he continued to own the assets he now claims to have transferred to repay the "loans." (*See* Exh. E, at 29 at ¶ 79.)

\*       \*       \*       \*

These three examples are just a small part of Stagg's well-established pattern of transferring and concealing assets to avoid court orders. Simply put, court orders do not matter to Stagg; he believes that if he intentionally divests his companies of assets, courts cannot hold him or his companies accountable for their misdeeds and will grant whatever relief they request. While this evidence shows that SV Master Fund's requested relief is unwarranted, as described below, SV Master Fund own exhibits prove that the relief is unnecessary.

## POINT II

## SV MASTER FUND POSSESSES ASSETS SUFFICIENT TO COMPLY WITH THE ESCROW ORDER

More important for the purposes of this motion, Plaintiffs' motion should be denied because SV Master Fund admits it owns assets far in excess of the $4.1 million it has been ordered to place in escrow. In connection with its most recent motion to reconsider, SV Master Fund submitted an unaudited balance sheet (Dkt. No. 311-3) that shows that SV Master Fund's equity interest in Mas Global, which Plaintiffs and Stagg control, is worth *at least* $23.7 million.[9] Plaintiffs' motion confirms that SV Master Fund still owns this asset and does not contend that its value on the unaudited balance sheet is incorrect or inflated.[10]

---

[9] According to Stagg, 99.5% of Mas Global is owned by entities he controls: SV Master Fund owns 98% of Mas Global and 3V Capital Fund Ltd., an offshore feeder fund that has no investors, ceased operations in or about September 2007, and has no other assets, owns 1.5% of Mas Global. (Exh. H, at 75:15-76:25 (Scott Stagg 1/27/11 deposition transcript).) The remaining .5% of Mas Global purportedly is owned by Amir Kahn, a former employee of Stagg's at Stagg Capital Group and Aurora. (*Id.*)

[10] Even if SV Master Fund's unaudited balance sheet did not confirm SV Master Fund's ability to satisfy the Order, the unaudited balance sheet is not credible evidence that would support granting the second motion for reconsideration because the balance sheet is facially inaccurate and misleading. Indeed, Plaintiffs submitted the unaudited balance sheet to the Court despite knowing that it omits *at least* three additional assets that SV Master Fund admits its owns, which can also be marshaled to comply with the Order:

Instead, Plaintiffs baldly assert that SV Master Fund "cannot monetize its equity interest in Mas Global" to satisfy the Order (or return the more than $4.1 million indisputably owed to Mr. Katcher). This self-serving and belated argument is unavailing and insufficient to grant the second motion for reconsideration. SV Master Fund never before raised this argument, which is SV Master Fund's transparent last gasp attempt to avoid complying with the Order. While it may be true that SV Master Fund would *prefer* not to monetize any part of its equity interest in Mas Global to comply with the Order, Plaintiffs provide no support for the claim that SV Master Fund "cannot" do so. Indeed, Plaintiffs offer no credible evidence that

- *First*, the balance sheet omits an approximately $1 million receivable that SV Master Fund is owed from Mas Global. Stagg testified just four days before the balance sheet was apparently created that SV Master Fund listed this asset on its financial statements. (*See* Exh. H, at 322:04-323:07, 325:06-09 (Scott Stagg 1/27/2011 deposition transcript).) Not only does the omission of the receivable from the unaudited balance sheet cast doubt on the balance sheet's accuracy and completeness, but there is no question that SV Master Fund can obtain repayment of that receivable and use those funds to partially satisfy the Order. As Stagg explained, "if SV [Master Fund] needs to pay legal fees, [SV Master Fund] basically ask[s] for a repayment of the monies or [account] receivable." (*Id.* at 74:22-75:02; *see also* Exh. I, at 194:09-10 (Scott Stagg 2/3/2011 deposition transcript) (testifying that MAS Global owes these funds to SV Master Fund).) Just as SV Master Fund can access funds it is owed by MAS Global when it needs to pay legal or other fees (to, for example, Stagg's brother), it can and should retrieve those funds to satisfy the Order.

- *Second*, the balance sheet inexplicably omits the assets held in SV Master Fund's account at GarWood Securities, which according to records produced by SV Master Fund, were valued at more than $33 million as of January 31, 2011, the date of the balance sheet. (*See* Exh. J, at 3VC 002943.) Plaintiffs now contend that the securities in the GarWood account were inaccurately priced (and conveniently repriced in June 2011). This argument is an obvious red herring. The balance sheet confirms that SV Master Fund owns sufficient assets to comply with the Order regardless of the value of the securities at GarWood; in other words, the value of the GarWood securities are irrelevant to SV Master Fund's ability to fully comply with the Order. But even were it true that the securities were inaccurately priced and have no value, the omission of those securities from the unaudited balance sheet—at *any* price—makes clear that the balance sheet is not a full and accurate disclosure of SV Master Fund's assets. Moreover, whatever their current value, there is no reason SV Master Fund cannot also liquidate the securities and place the proceeds in escrow in partial compliance with the Order.

- *Third*, the balance sheet also fails to include the cash in SV Master Fund's JP Morgan bank accounts despite Stagg's testimony on January 27, 2011—just four days before he prepared the balance sheet—that SV Master Fund had a "hundred, a couple hundred thousand" in cash at JP Morgan Chase. (Exh. H, at 67:20-25, 324:03-14 (Scott Stagg 1/27/2011 deposition transcript); *see also* Exh. I, at 194:01-03 (Scott Stagg 2/3/2011 deposition transcript).) Further, Plaintiffs submitted the balance sheet despite admitting in their second motion for reconsideration that SV Master Fund currently has at least $51,340.59 in cash in its bank accounts. (Dkt. No. 311-7, at 2.) Again, the omission of those funds from the unaudited balance sheet confirms that the balance sheet is not a full and accurate disclosure of SV Master Fund's assets.

SV Master Fund even made any attempt or inquiry to monetize its Mas Global interest to satisfy the Order.

More importantly, SV Master Fund's contention that it cannot monetize any portion of its Mas Global interest because the company is a private entity and not traded on any exchange is simply ridiculous. Interests in private companies are routinely bought and sold. Alternatively, SV Master Fund's equity interest in Mas Global provides it numerous alternative options to secure cash sufficient to comply with the Order (and return Mr. Katcher's money), such as obtaining a loan secured by the equity interest or seeking a third-party capital investment in Mas Global.[11]

Finally, Plaintiffs' motion should be denied because they merely seek to relitigate an issue that they failed to raise until after the Order was entered and has already been decided in any event. Plaintiffs argue that a "manifest injustice will occur" if they are required to comply with the Order, but this is the same argument the Court already correctly rejected because it would not be "impossible" for SV Master Fund to comply with the Order. Since the Court denied that motion for reconsideration, there has been no change in controlling law, new evidence, or any new supposed manifest injustice. In addition, as the Court recognized in denying Plaintiffs' first motion to reconsider, SV Master Fund never suggested

---

[11] Plaintiffs' suggestion that Defendants believe Mas Global's stock is worthless (Pl. Br. at 3) is a blatant mischaracterization and irrelevant to SV Master Fund's ability to comply with the Order. In connection with a Connecticut state court proceeding, Defendants correctly argued that SV Master Fund's offer of *shares* of Mas Global was insufficient to satisfy the PJR Order because Stagg's total control over Mas Global and well-documented pattern of stealing from Katcher, concealing assets, and transferring money (all in violation of court orders) provided no security that the Mas Global shares would have any value when a judgment ultimately was rendered in favor of Mr. Katcher. (*See* Exh. K, at 3-12 (Plaintiff's Opposition to Defendants' Motion to Modify the Court's February 1, 2011 Order).) The Connecticut State Court agreed and did not accept SV Master Fund's attempt to satisfy the PJR Order with Mas Global shares. However, other than Stagg's desire to continue looting SV Master Fund through Mas Global to fund his personal expenses, nothing prevents SV Master Fund from monetizing its Mas Global interest to satisfy the Order.

(prior to the Order) that it could not satisfy the Order despite numerous opportunities to do so—including during the May 4, 2011 summary judgment hearing, the June 23, 2011 status conference, or in any prior pleading. There is no doubt that SV Master Fund was aware of that argument prior to entry of the Order, because it was making the exact same argument to the Connecticut state court as early as February 2011. (*See* Exh. K (Plaintiff's Opposition to Defendants' Motion to Modify the Court's February 1, 2011 Order) (responding to SV Master Fund's argument that it could not comply with the PJR Order).) That Court too rejected SV Master Fund's unsupported argument. Plainly, SV Master Fund only "lacks" assets when it is ordered to repay Katcher, and its motions for reconsideration are only another attempt to avoid court orders and avoid liquidating or monetizing any of its assets.

## CONCLUSION

SV Master Fund owns assets it concedes are worth many multiples of the $4.1 million that it wrongfully possesses and owes to Mr. Katcher. The Court properly ordered SV Master Fund to place $4.1 million into an escrow account for Mr. Katcher's benefit. There is no basis for Plaintiffs' continued refusal to comply with the Order. The motion for reconsideration should be denied with prejudice and SV Master Fund should be ordered to comply with the Order within ten days.

DEFENDANTS,
KNIGHT LIBERTAS LLC, KNIGHT
LIBERTAS HOLDINGS LLC, LIBERTAS
HOLDINGS LLC, LIBERTAS PARTNERS
LLC AND GARY KATCHER

By: /s/ Howard Schiffman
Howard Schiffman (*pro hac vice*)
Jeffrey F. Robertson (*pro hac vice*)
Andrew P.C. Wright (*pro hac vice*)
Schulte Roth & Zabel LLP
1152 Fifteenth Street, NW
Suite 850
Washington, DC 20005
Tel. (202) 729-7470
E-mail: howard.schiffman@srz.com
E-mail: jeffrey.robertson@srz.com
E-mail: andrew.wright@srz.com

And

Frederick S. Gold  (ct03560)
Eric Lubochinski  (ct 25842)
Shipman & Goodwin LLP
300 Atlantic Street, Third Floor
Stamford, CT 06901
Tel. (203) 324-8100
Fax (203) 324-8199
E-mail: fgold@goodwin.com
E-mail: elubochinski@goodwin.com

Their Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2011 a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                    /s/Eric Lubochinski  
                    Eric Lubochinski

2043893v1  
DOC ID-17380986.6