# Schulte Roth&Zabel LLP

1152 Fifteenth Street, NW, Suite 850
Washington, DC 20005
202.729.7470
202.730.4520 fax

www.srz.com

Writer's Direct Number
202.729.7478

Writer's E-mail Address
jeffrey.robertson@srz.com

December 2, 2011

**VIA E-MAIL**

Mr. Robert Sprague
Deloitte Financial Advisory Services LLP
200 Berkeley Street
Boston, Massachusetts 02116

    Re: *SV Special Situations Master Fund Ltd. et al v. Knight Libertas LLC, et al.,*
       D. Conn., No. 3:08-cv-01769 (SRU)

Dear Mr. Sprague:

    As you know, we represent defendants Knight Libertas LLC, Knight Libertas Holdings LLC, Libertas Partners LLC, Libertas Holdings LLC, and Gary Katcher ("Defendants") in the above-referenced matter. We submit this letter in response to Deloitte Financial Advisory Services LLP's ("Deloitte") Fourth Document Request Letter.

    The Fourth Document Request Letter addresses numerous issues raised by Plaintiffs that are far beyond the scope of the order appointing Deloitte, including Plaintiffs' speculative theories that Libertas would not exist "but for" the $8.9 million at-issue transfer receipts. Those hypothetical theories fail as a matter of law and common sense, and requests related to them fall far outside the narrow tasks assigned to Deloitte by Judge Underhill. The thousands of pages of documents we have previously provided identify the entities that received the $8.9 million at-issue transfer receipts and, sensibly, that the value of the $8.9 million at-issue receipts was limited to the amount of those transfers. Many of the questions below are irrelevant to the questions that Deloitte was appointed to address. Nevertheless, Defendants have endeavored to answer Deloitte's questions and are looking forward to receiving Deloitte's report on December 19, 2011.

         \*            \*            \*

    Request No. 1: Libertas Partners LLC Pershing Account # 54L-017990 ("the Escrow Account"), for the statement period from May 1 to May 30, 2006, indicates nine deposits listed below:

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 2

| Libertas LLC Brokerage ACC 54L-017990 | | |
|---|---|---|
| Date | Deposit | Detail |
| May 3, 2006 | $ 132,604.90 | Second Party Checks 0517 |
| May 3, 2006 | $ 132,604.90 | Second Party Checks US Bank 0396 |
| May 3, 2006 | $ 132,540.79 | Second Party Checks US Bank 0032 |
| May 3, 2006 | $ 132,113.64 | Second Party Checks US Bank 0879 |
| May 3, 2006 | $ 132,107.95 | Second Party Checks US Bank 0274 |
| May 3, 2006 | $ 132,091.09 | Second Party Checks US Bank 0153 |
| May 3, 2006 | $ 132,090.97 | Second Party Checks US Bank 9911 |
| May 3, 2006 | $ 132,090.96 | Second Party Checks US Bank 0639 |
| May 3, 2006 | $ 132,090.96 | Second Party Checks US Bank 0762 |

Please provide the following with respect to the nine transactions listed in the table above:

i.  Explanations as to the nature and source of the deposits

**Response:**  The nine deposits represent distributions from aircraft statutory trusts related to the CBI transactions, as described more fully in Defendants' November 10, 2011 letter.

ii.  Any supporting documentation including, but not limited to deposit receipts and copies of checks.

**Response:**  Please see the enclosed documents bates-labeled K059536-538 and the Donohue Report, Exhibit 4A.

Request No. 2:  In our Second Document Request Letter dated October 17, 2011, we inquired about disbursements from Libertas totaling $4,839,683.49 to Quadrangle Group LLC ("Quadrangle").  The Defendants stated in their response letter dated November 10, 2011 that the disbursements related to Certificates of Beneficial Interest Distributions ("CBIs") owed to Quadrangle.  In addition, in their November 10, 2011 response letter, page 6, the Defendants

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 3

indicated they received "approximately $4.7 million" from Ore Hill related to the Quadrangle CBIs, (collectively the "Quadrangle Transaction"). In relation to the Quadrangle Transaction:

> i. What is the nature of the difference between the $4,839,683.49 paid to Quadrangle and the "approximately $4.7 million" received from Ore Hill?

**Response:** The $4,839,683.49 disbursements to Quadrangle relate to a November 11, 2005 CBI trade between Ore Hill (seller) and Quadrangle (buyer), which was brokered by Libertas (the "Quadrangle CBI Trade"). As described in our November 10, 2011 letter, the certificates were not timely re-registered in the buyer's (Quadrangle) name and the trustee paid distributions to Ore Hill rather than to Quadrangle. Rather than collecting distributions from Ore Hill when Quadrangle inquired about the status of the distributions, Libertas simply fronted the distributions without having received them from Ore Hill.

The difference between $4,839,683.49 claimed by Quadrangle and the $4,711,526.89 effectively received from Ore Hill on November 4, 2009 appears to result from a difference in reconciling the monthly lease payments paid by the trustee and owed to Quadrangle. This transaction involved monthly lease payments and distributions from nine separate planes. It appears that some monthly lease payments were not included in the reconciliation of what Ore Hill owed to Quadrangle but were included in Quadrangle's reconciliation of what it was owed. The difference was not due to any commission payment or principal loss or gain on the trade.

> ii. The Defendants provided Deloitte FAS with the Expert Report of James J. Donohue dated November 3, 2011 (the "Donohue Report"). The Defendants referred to Appendix 4(a) of the Donohue Report to support their claim that Libertas received approximately $4.7 million from Ore Hill. Please identify the transactions on appendix 4(a) of the Donohue Report that make up the approximate $4.7 million in distributions.

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 4

**Response:** To be clear, as Defendants explained in their November 11, 2011 letter (at 5-6), Libertas did not actually receive $4,711,526.89 from Ore Hill. Rather, on November 4, 2009, the Libertas Principal Trading Account at Pershing received $1,587,114.89 from Ore Hill, which deposit is listed on Exhibit 4A to the Donohue Report.

The $1,587,114.89 deposit related to the Quadrangle CBI Trade <u>and</u> a June 17, 2005 CBI trade between PIMCO (seller) and Ore Hill (buyer), which was brokered by Libertas (the "PIMCO CBI Trade"). Again, in the PIMCO CBI Trade the certificates were not timely re-registered in the buyer's name (Ore Hill) and the trustee paid the distributions to PIMCO rather than Ore Hill. So, to reconcile the amount owed from Ore Hill from the Quadrangle CBI Trade ($4,711,526.89) with the amount owed to Ore Hill from the PIMCO CBI Trade ($3,124,412.00), Ore Hill paid the difference ($1,587,114.89) to Libertas. (*See* K057931; K059615.)

<u>Request No. 3</u>: The Plaintiffs stated in their response letter dated October 5, 2011 that if Libertas had not made payments totaling $4,829,683.49 to Quadrangle for the Quadrangle Transaction, Quadrangle would have reported Libertas to the Financial Industries Regulatory Authority ("FINRA"). Additionally in the Plaintiffs response letter dated November 17, 2011, Plaintiffs state that "Libertas would have … lost its broker-dealer license if Libertas had not misappropriated millions of dollars." Please provide Deloitte FAS with the following information:

    i.    What is the basis for the claim that "Libertas would have … lost its broker-dealer license?" Please explain the relationship between the misappropriation referred to above and the potential rescission or suspension of its broker-dealer license?

**Response:** Plaintiffs have no basis for the fanciful and farfetched speculation that underlies their claim. There is no evidence that Quadrangle ever threatened to "report" Libertas to FINRA, much less that Libertas Partners would have been at risk of its broker-dealer license being suspended or revoked had Quadrangle done so. Nor is there any evidence that the liquidating trustee's payment of the CBI distributions to Ore Hill (rather than to Quadrangle)

Case 3:08-cv-01769-SRU   Document 337-2   Filed 12/08/11   Page 5 of 11

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 5

would have resulted in any investigation of or disciplinary action against Libertas, much less a suspension or expulsion of Libertas by FINRA. Indeed, the regulatory decisions cited by Plaintiffs in their October 5, 2011 letter are completely inapposite.[1]

While it seems clear that Plaintiffs' baseless claims have no bearing on the limited tasks set forth in Judge Underhill's order, Plaintiffs presumably base their overreaching claim on SEC Rule 15c3-1(a)(2)(iii), which requires broker-dealers to a maintain a specified net capital. However, the notion that Libertas Partners would have violated this rule, or would have lost its broker-dealer license if it did, is baseless. As Defendants noted in their November 28, 2011 letter, Libertas Partners had numerous alternatives available to address any operational or net capital shortfall, including but not limited to capital infusions from equity holders or outside investors, seeking alternative financing, or reducing expenses (including ceasing payments for 3V-related expenses or not fronting CBI payments). More specifically to the Quadrangle transaction, if Libertas had been aware that fronting the CBI-related distribution payments to Quadrangle would have put it at risk of temporarily violating its net capital requirements, Libertas could have simply collected from Ore Hill the funds that were owed to Quadrangle. In any event, Plaintiffs' speculation is unsupportable and irrelevant to Deloitte's completion of the tasks set forth in Judge Underhill's order.

    ii. During the period from January 1, 2005 though December 31, 2006 were the Defendants subject to any regulatory inquiries or investigations?

---

[1] The broker-dealer in *In Re Prestige Fin. Ctr.* agreed to be was expelled for violating essentially every FINRA/SEC rule *except* the net capital requirements. In fact, the settlement agreement notes that a *prior* net capital violation resulted in a fine, not expulsion. Similarly, *FINRA v. ITradeDirect.com* involved a default judgment where FINRA alleged a similar litany of regulatory violations. Following Itrade's default, FINRA expelled it for several of these violations, but *refused* to impose any sanction for the net capital issues, even though they allegedly existed for well over a year.

DOC ID-17722539.6

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 6

**Response:** Defendants were not the subject of any regulatory inquires or investigations related to the Quadrangle transaction or FINRA's net capital requirements. A list of the regulatory inquiries and investigations involving Libertas Partners is included in the attached BrokerCheck Report available from the FINRA web site. (*See* K059588-059614.)

  iii. If the Defendants were not the subject of any regulatory inquiries or investigations during that timeframe, did they receive any communications or notifications from regulators regarding their compliance with regulatory requirements, or the status of their broker-dealer license? If so, please provide.

**Response:** Other than as noted in noted in response to Request No. 3(ii), Defendants are not aware of communications or notifications from regulators during the relevant timeframe regarding either their compliance with regulatory requirements or Libertas Partners' broker-dealer license.

  Request No. 4: In our Initial Document Request Letter dated September 23, 2011, we inquired about a payment of $3,102,531.47 made by 3V Master Fund to Credit Suisse (the "Transport Transaction"). The Plaintiffs provided Deloitte FAS with information pertaining to the Escrow Account for the statement period from February 1, to February 28, 2006 (bates number PERS 270-273). Per the Escrow Account (bates number PERS 270-273), Libertas received $3,142,531.47 from DE Shaw on February 16, 2006, transferred $3,102,531.47 to Credit Suisse on February 17, 2006 and subsequently recalled and received the same amount on February 28, 2006. Please provide explanation as to how the $3,102,531.47 was utilized and by whom it was utilized after Libertas received it back into the Escrow Account on February 28, 2006. Please provide supporting documentation to substantiate your explanation.

  **Response:** It is virtually impossible to determine how the $3,102,531.47 was utilized. There does not appear to be any corresponding transfer of the $3,102,531.47 after those funds were returned to Libertas by Credit Suisse's bank and once the funds were combined with the funds already in the Escrow Account, the account balance was $8,529,363.20. (*See* PERS 00270.) The $3,102,531.47 received from Credit Suisse's bank was not segregated from the funds already in the Escrow Account or from subsequent deposits. In fact, given the numerous

DOC ID-17722539.6

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 7

expenses Libertas paid on behalf of the 3V entities, it is impossible to say that some part of the $3,102,531.47 was not used for 3V's benefit.

Request No. 5: In our Initial Document Request Letter, we inquired about a disbursement from the Escrow Account dated May 12, 2006 to JP Morgan Chase. We received the "PAY 0123 – PAY 0124" document, which contains reference to the $899,502.19 payroll disbursement for the pay run dated May 11, 2006. Did Libertas record the $899,502.19 payroll transaction in its accounts or general ledger? If so, please provide supporting documentation of the accounting entries to record the $899,502.19. If payroll disbursement amounts were not recorded in its accounts or general ledger, how were such amounts recorded in Libertas' financial statements?

**Response:** Various payroll-related expenses were recorded in Libertas Holdings and Libertas Partners' Quickbooks accounts in May 2006, and throughout the rest of the year. These payroll entries generally relate to salaries and commissions but do not always correspond to specific wire transfers. For example, Libertas Partners' Quickbooks records reflect monthly salary and commission journal entries that do not appear to be directly associated with wire transfers. At least some portion of the $899,502.19, which includes salaries, commissions, and taxes for Libertas and 3V employees, could be reflected as salaries in the Libertas Partners May month-end entry. But while it is possible that all or some portion of the $899,502.19 is represented by these payroll-related entries, we have not located a specific accounting entry in the Quickbooks general ledger that relates to this specific wire transfer.

Request No. 6: In our Third Document Request Letter dated November 7, 2011, Deloitte FAS inquired about allocation of expenses between Plaintiffs and Defendants for the $899,502.19 payroll disbursement. While Deloitte FAS received various documents from both Parties in response to this inquiry, these documents do not provide an analysis of the allocation of the $899,501.19 [sic] between employees of the Plaintiffs and Defendants. Please provide Deloitte FAS with detailed supporting documentation showing allocation of the $899,501.19 between the Parties.

**Response:** Defendants previously produced the payroll detail with a list of the employees providing services for the 3V entities (and supporting evidence). In addition, a

DOC ID-17722539.6

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 8

cumulative analysis of the payments made by Libertas on behalf of the 3V entities was complied in 2008 by Libertas, assisted by third-party accountants, which Defendants also previously provided, by letter dated September 9, 2011, as part of Defendants' Opposition to Plaintiff's and Third-Party Defendants' Motion for Summary Judgment (*see* Exhibit A to the Patricia M. Havey Affidavit dated March 18, 2011 and Defendants' Opposition to Plaintiff's and Third-Party Defendants Scott A. Stagg's and 3V Capital Management LLC's Motion for Summary Judgment, at 23-27.)  There is no dispute that Libertas paid all the expenses recorded in the analysis, and that the 3V entities paid virtually no expenses from their inception until 2007 (by which time the 3V entities' assets under management had grown to approximately $550 million), and the independent auditors for Libertas and 3V Capital Master Fund Ltd. reviewed that analysis and approved the accounting treatment for the reimbursement.

As noted by Deloitte, Mr. Donohue performed an additional cumulative analysis, which totaled the expenses paid by Libertas on behalf of the 3V entities.  That analysis was included in the Donohue Report at 8-9.  Defendants are aware of no other relevant analyses.

Request No. 7:  The Plaintiffs submitted a letter to the Defendants dated October 26, 2011 requesting production of the Amended and Restated Interest Purchase Agreement by and among Knight Capital Group, Inc., Knight/Trimark, Inc., Libertas Holdings LLC, New Libertas Holdings LLC and Gary Katcher, dated May 5, 2008 (the "Purchase Agreement").  Please provide Deloitte with the Purchase Agreement and all exhibits, attachments, appendices (or equivalent) for this transaction.

**Response:**  The material terms of the Purchase Agreement are not in dispute, have already been provided to Deloitte via publicly-available documents, and are irrelevant to the tasks assigned to Deloitte and the transfers at issue in this case.  Deloitte has already received every relevant document produced in discovery and hundreds of pages of additional documents.

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 9

The Purchase Agreement itself is a confidential document that was not produced in discovery in this case and its production now would not further Deloitte's efforts or the facts relevant to this case. Indeed, Plaintiffs discovery request for the Purchase Agreement came almost ten months after this case's more than two-year discovery period ended and is void.

<u>Request No. 8</u>: In our Initial Document Request Letter, we inquired about the nature of the Libertas Partners LLC Pershing Escrow Account # 54L-017990 (the "Escrow Account"). The Defendants stated in their response letter dated September 30, 2011 that the account was not included in the Libertas general ledger(s) in 2006. In relation to this account:

    i.    Was this account included in the consideration for the Libertas purchase?

**Response:** As the Donohue Report explains, the Escrow Account was outside Libertas' accounting records and financial statements and was not reflected in the Libertas general ledger. Thus, there is no evidence that Knight considered or even could have considered the Escrow Account in its deliberations regarding the Libertas acquisition. More importantly, as the O'Neill Report explains, the 2008 acquisition of Libertas was a strategic acquisition by Knight focused on a valuation driven by future projected revenues. The Escrow Account did not impact Knight's revenue-based valuation and was irrelevant to the Libertas purchase.

    ii.    Were there any other escrow accounts utilized by the Defendants that were not included in the Libertas general ledger(s)? Please provide details of any such accounts. If Libertas maintained any other escrow accounts that were not included in the Libertas general ledger, were they included in the purchase consideration and provide the details of these accounts to Deloitte FAS.

**Response:** Defendants are not aware of any other escrow accounts that were not included in the Libertas general ledger.

    iii.    What was the balance in the Escrow Account (and any other escrow accounts, if applicable) at the time when Knight purchased Libertas?

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 10

**Response:** On May 5, 2008, the date the Libertas acquisition was announced, the balance of the Escrow Account was $0.  (*See* K059585.)  When the transaction closed on July 11, 2008, the Escrow Account balance was $32.83.  (*See* K059575.)  The balance has remained the same ever since.  (*See* K059567-K059580; K059563-059566.)

      iv.      How was the Escrow Account (and other escrow accounts, if applicable) subsequently used?  Please provide supporting details.

**Response:** Libertas has not been actively utilized the Escrow Account since mid-2007.  The Escrow Account was opened in or around 2005 by Mark Focht. (*See* Mark Focht December 13, 2010 deposition at 53:21-55:22 (transcript provided by letter dated August 5, 2011).)  In or about mid-2007, Mr. Focht began working exclusively for the 3V entities, and Libertas began reconciling their accounts and stopped using the Escrow Account.  Thus, the Escrow Account has not been actively utilized since before the Libertas acquisition.[2]

      Request No. 9:  The Defendants provided Deloitte FAS with the Sandler O'Neill model ("KnightCap835-841")(the "Model").  The Defendants affirmed in their response letter dated November 10, 2011, that Sandler O'Neill prepared the Model after Knight and Libertas had agreed to the terms of the Libertas acquisition.  What was the purpose of this Model given that it was created after the purchase decision?  Do the Parties have any analysis or models that were prepared in connection with the purchase decision?  If so, please provide to Deloitte FAS.

**Response:** Again, the Libertas acquisition was based on projected future revenues, as demonstrated in the Project Freedom presentation and explained in the O'Neill Report, which we have previously provided to Deloitte.  Knight correctly foresaw the strategic

---

[2] Since Knight agreed to purchase Libertas, the only activity in the Escrow Account resulted from erroneous wire instructions provided in connection with a trade Libertas brokered between JP Morgan and Mulberry Master Fund: on May 27, 2008, the Escrow Account received a wire of $693,065.17; after obtaining compliance approval from Libertas' clearing firm, on June 12, 2008 those funds were consolidated into Libertas' firm trading account (54L-891006); all remaining aspects of the transaction settled through that account.  (*See* K059580-059587, K059554-059562.)

DOC ID-17722539.6

Deloitte Financial Advisory Services LLP
December 2, 2011
Page 11

potential to diversify and expand its revenues, using Libertas' experience and client relationships, in an area of the market that was poised to (and did) grow rapidly. The acquisition was pushed by a Knight consultant who prepared the Project Freedom presentations, based on Libertas' past revenues, to sell the acquisition and the materials terms of the acquisition were agreed upon by Knight based on that analysis. As Defendants advised in their letter dated November 11, 2011, no other models exist.

      The Sandler O'Neill analysis was created after the acquisition terms were agreed upon to provide an analysis for Knight's board of directors of whether the acquisition was expected to be accretive or dilutive to Knight shareholders. The Sandler O'Neill analysis was not part of the acquisition negotiations and had no effect on the agreed price, which was agreed to before the Sandler O'Neill analysis was created. Obviously, as described in the O'Neill Report, that accretion analysis was not impacted by the $8.9 million at-issue transfers.

      *            *            *

      We trust that you will find the foregoing useful in connection with the review the Court has ordered Deloitte to conduct related to the $8.9 million transfers identified in the Court's order. Should you have any additional questions, please let us know.

      Regards,

      /s/ Jeffrey F. Robertson

      Jeffrey F. Robertson

cc:    Andrew Kazin, Esq.

DOC ID-17722539.6