```
               UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x

SV SPECIAL SITUATIONS MASTER    :  No. 3:08CV-1769 (SRU)
FUND, LTD.                      :
                                :  915 Lafayette Boulevard
         vs.                    :  Bridgeport, Connecticut
                                :
                                :  December 9, 2011
KNIGHT LIBERTAS, LLC, ET AL     :

- - - - - - - - - - - - - - - - x


                  TELEPHONE CONFERENCE


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

   FOR THE PLAINTIFF:

        STAGG, TERENZI, CONFUSIONE & WABNIK
            401 Franklin Avenue – Suite 300
            Garden City, New York  11530
         BY: ANDREW KAZIN, ESQ.

   FOR THE DEFENDANTS:

        SCHULTE, ROTH & ZABEL, LLP
            1152 Fifteenth Street, NW
            Washington, DC  20005
         BY: HOWARD SCHIFFMAN, ESQ.
             JEFFREY F. ROBERTSON, ESQ.


              Susan E. Catucci, RMR
              Official Court Reporter
              915 Lafayette Boulevard
           Bridgeport, Connecticut  06604
                Tel: (917)703-0761
```

1          (Whereupon the following session was held in
2     chambers telephonically.)
3                    (1:00 O'CLOCK, P. M.)
4              THE COURT:  Good afternoon.
5              MR. KAZIN:  Andrew Kazin for the plaintiffs.
6              MR. ROBERTSON:  Good afternoon.  This is Jeff
7     Robertson and Howard Schiffman, Schulte Roth, for the
8     defendants.
9              THE COURT:  Okay.  We're on the record, so if
10    each of you could identify yourselves each time you speak,
11    that would be helpful.
12             Do we have anyone from Deloitte on the phone?
13             MR. SPRAGUE:  Yes, Your Honor.  This is Bob
14    Sprague.  And Adam Weisman is on as well.
15             THE COURT:  Okay, great.
16             MR. WEISMAN:  And Howard Molly (ph) is with me.
17             THE COURT:  I'm sorry, who said that?
18             MR. WEISMAN:  I'm sorry.  Adam Weisman, Your
19    Honor.  Howard Molly is with me.
20             THE COURT:  All right, thank you.  Anybody else?
21             All righty.  We have, it sounds like, an issue
22    about production of documents to Deloitte.  Let me just
23    first have Deloitte confirm that they've requested or
24    identified the documents that they've requested that they
25    have not received.

1          MR. SPRAGUE:  Your Honor, this is Bob Sprague.
2  I think there are essentially two documents, one that we
3  requested and hasn't been provided, and another document
4  that we just sort of have a question about.
5          The document that we requested that hasn't been
6  provided at this point is the definitive purchase
7  agreement for the Knight Libertas transaction.
8          The second document is the valuation model that
9  was used at the time of the acquisition.  We did receive a
10 model that we understand was put together by a consultant,
11 an external consultant, subsequent to the decision for the
12 transaction to consummate, and we were looking for
13 something that was sort of pre-transaction.  And I guess
14 we don't know if that document exists but it would
15 certainly be something we would generally expect to see in
16 a transaction.
17         So those are generally the two documents that
18 we're looking for.
19         MR. SCHIFFMAN:  John, this is Mr. Schiffman, I
20 think the second one is easy.  That document does not
21 exist.  I think we have told Deloitte that the only, the
22 only other model that exists is the model of Project
23 Freedom, and that the price was actually reached by
24 conversations.  We put this in a letter to them.  There is
25 no model.  That essentially Mr. Ketcher and Knight

1    negotiated a document based on revenue growth and that's
2    where the price came from, and then subsequently models
3    were applied and we have given them the subsequent models.
4             So, we have given Deloitte all of the
5    information that exists on this issue.  There simply was
6    no model because this was not a financially based
7    transaction, as we said in our letters with them, but was
8    a strategic transaction.  And essentially the purchase
9    price that was negotiated between Mr. Katcher and the
10   Knight people based on the strategic value of the revenue
11   stream, and we've put that in our letter to them.
12            THE COURT:  All right.  And what about the
13   purchase agreement?
14            MR. ROBERTSON:  Your Honor, this is Jeff
15   Robertson.  Our position all along has been that the
16   purchase agreement is not relevant to either this
17   litigation or to the exercise that Your Honor has asked
18   Deloitte to undertake.
19            The terms of the acquisition have been provided.
20   They are clear.  There's no issue about what those terms
21   are, and we have taken the position that anything beyond
22   that is simply not necessary for Deloitte's work here or
23   for any issue in the litigation.
24            I mean the terms are not in dispute.  There's
25   really no reason for us to provide that document.  One of

1  the things that plaintiffs have argued is that they need
2  to identify who the shareholders of New Libertas, the
3  entity that actually received the consideration for the
4  sale of Libertas, who those shareholders were.  But that
5  information, likewise, has already been provided both to
6  Deloitte and to the plaintiff several times here.
7           So, for all those reasons, we don't think
8  there's any reason for us to be producing the purchase
9  agreement, which is a confidential agreement that is very
10 sensitive, and for that reason, Your Honor, we have not
11 provided it.
12          MR. SCHIFFMAN:  Your Honor, this is
13 Mr. Schiffman.  Again, we know, we are highly aware of
14 what Your Honor's view on this is and to some extent we
15 did this because we'd like to have a conference call about
16 this issue.
17          Again, we at this point really, as we've said
18 over and over again, I think we have to have some sort of
19 metes and bounds as to what Deloitte is doing.  I think
20 that they have gone, understandably, well, well, well
21 beyond what Your Honor set out for them.  They are not
22 doing an accounting.
23          For example, they asked us last week for the
24 regulatory history of Libertas.  All right?  Because in
25 connection with a transaction, they've now figured out who

1  got the money.  So now, after doing the accounting part of
2  it, which I think was never really in dispute, they
3  figured out who got the money, plaintiffs then say, well,
4  if they didn't pay X, X would have complained to the SEC
5  or FINRA.  That would have resulted in the SEC or FINRA
6  closing Libertas down.  Libertas then would have been
7  closed down by an investigation.  Therefore, in a "but
8  for" theory, this is a very valuable transaction.
9              Now, Deloitte now says to us, we want all of the
10 regulatory history of Libertas.  We are going ever and
11 ever, ever further from the task at hand.  And I
12 understand that Your Honor wants to give them leeway but
13 there comes a point in time where we need to really have
14 some metes and some boundaries to this exercise.
15             And I think this begins -- this agreement, I'm
16 sure it's curious.  I'm sure one can articulate a reason
17 why you might like to look for it, but it goes way beyond
18 any accounting issue which is what I thought they were
19 tasked for.
20             In fact, this very document, like other
21 documents that Your Honor's ruled about and about which
22 you whacked me already once before -- so I come here with
23 my head low and bobbing and weaving -- is that this is a
24 document which we didn't produce in discovery that we had
25 this very argument over relevance, and now what's

1    happening is Deloitte, in ever expanding relevancy because
2    they are trying to be thorough and complete, is they
3    are -- there's just no boundaries to where we're going and
4    we think that it really is important.  I think we've spent
5    over 400,000-dollars already.
6               Again, we continue to gripe about the expense.
7    We continue to gripe, we don't understand how Mr. Stagg
8    continues to pay 125,000-dollars' cash to Deloitte to do
9    this exercise where he still hasn't posted any money in
10   relationship to our bond.
11              This whole process has, we fear, to the best
12   intentions, continues to spin out of control and we'd ask
13   the court to bring it to an end.
14              I think the answer which Your Honor asked, which
15   is a relatively simple accounting question, has long since
16   been answered.  We now know where the eight -- was it 8.1?
17   Where the 8.9 money came in.  We know, as I think we
18   always knew, Your Honor, where it went.  There's no doubt
19   about that.  We now know without any doubt that that money
20   is not in the books and records.  The revenue is not in
21   the books and records.  Deloitte has now done all sorts of
22   testing to show that that money was not in the records.
23   They've done all sorts of testing to show that that money
24   was not in the book which Knight looked at.
25              I think that, though you can always ask more

1   questions, you can always dig deeper, there needs to be
2   some conclusion to this and that's really why we, once
3   again, are urging Your Honor not to say, give them
4   everything they want.
5           THE COURT: Well, okay. Two things. First,
6   I've already seen this movie. I feel like this precise
7   argument has been made more than once in the past, and
8   that's not why we're here. We're here over one particular
9   document.
10          Have you ever heard of a reasonable accounting
11  firm looking into a purchase and sale, purchase and sale
12  transaction, and not being permitted to look at the
13  purchase and sale agreement? I can't imagine that
14  Deloitte is going to feel like it's done traditional,
15  normal, everyday accounting work if they don't see the
16  document at issue, the document that governed the
17  transaction.
18          MR. SCHIFFMAN: Again, I think that's precisely
19  the issue -- this is Mr. Schiffman, Your Honor. How do we
20  get to the issue is accounting for the purchase and sale?
21  Your very narrow order --
22          THE COURT: We have been over this and over this
23  and over this.
24          MR. SCHIFFMAN: I agree, Your Honor, and
25  again --

1          THE COURT:  Look, the question is why there are
2  not available reasonable controls to protect the
3  confidentiality of the agreement.  That's the only issue.
4  And I just don't see that there's any question that
5  Deloitte gets the purchase and sale agreement and the only
6  issue is are they doing what they need to do to make sure
7  that it remains confidential.
8          MR. SCHIFFMAN:  Again, I'm not overwhelmingly
9  concerned about confidentiality and I'm not
10 overwhelmingly -- I understand Your Honor's point.  Again,
11 I just think that, once again -- as you say, you've seen
12 this movie and you've already given it a bad review --
13 again, the whole drift of this is we never get to the end.
14         THE COURT:  We're getting to the end.  That's my
15 strong sense.  When we're down to talking about one or two
16 documents, I think we're pretty close to the end.
17         MR. SCHIFFMAN:  Is this call -- are we going to
18 meet the December 19th deadline?
19         THE COURT:  Well, probably not, since they don't
20 have the agreement.
21         MR. SCHIFFMAN:  Well, the agreement, the
22 agreement takes five minutes to review and everybody knows
23 what the agreement says.  The delay in getting the
24 agreement hasn't caused any delay in this process and
25 won't cause any delay in getting the report.  The

1   agreement, everybody knows what's in the agreement and so
2   that's not -- there's no delay caused by not getting the
3   agreement.  Everybody knows what's in the agreement.
4           THE COURT:  So turn it over.  If everybody
5   knows, there's really no reason why it's been withheld.
6           MR. SCHIFFMAN:  Again, again, we've made the
7   argument; you are rejecting it.
8           THE COURT:  Right, exactly.  Let's get the
9   agreement over there.  How quickly can you do that?
10          MR. SCHIFFMAN:  Tomorrow, right?  Tomorrow.
11          THE COURT:  Okay, great.
12          MR. SCHIFFMAN:  Can we get to the end though?
13  Are we going to make the December 19th deadline?
14          THE COURT:  I'm sure they are working real hard
15  to get that done and we'll get the report as soon as it's
16  ready, I'm sure.
17          MR. SCHIFFMAN:  Again, can we have a discussion
18  as to why we're giving regulatory history?  I mean how is
19  that an accounting issue?  I mean I ask it rhetorically
20  but, again --
21          THE COURT:  How --
22          MR. SCHIFFMAN:  Our frustration is we've gone --
23  we keep redefining what the task is.
24          THE COURT:  How many times do I have to say the
25  task is not strictly an accounting?

```
 1              MR. SCHIFFMAN:  Again, under the task you set,
 2    Your Honor, why is a regulatory history, our regulatory
 3    history something that's enlightening?
 4              THE COURT:  You know, I don't think I have to
 5    look behind reasonable efforts of the accounting firm to
 6    figure out what is happening.  If they need those
 7    documents, they are going to get those documents and we're
 8    going to get a report from them in due course.
 9              You know, you're going to have to come up with
10    much stronger arguments about why this is inappropriate
11    than simply you don't feel like turning it over and it's
12    beyond the scope of what they are doing.  I don't think
13    that's true.
14              So, let's get Deloitte what it needs to finish
15    this up so that we can all benefit from what they have to
16    say.
17              MR. SCHIFFMAN:  All right.
18              THE COURT:  Okay?
19              MR. SCHIFFMAN:  I guess while we are on the
20    phone, can we deal with the trial schedule, Your Honor?
21              THE COURT:  I would prefer not to.
22              MR. SCHIFFMAN:  All right. I just want to --
23    whenever you get a chance, I mean when you moved the trial
24    from May to June you bumped into my wife's vacation which
25    would cause me unbelievable distress and I can't move it
```

1   because she's running a triathlon which is on the date, so
2   it's not like I can move it to another time.
3           THE COURT:  Well, okay.
4           MR. SCHIFFMAN:  If we can just agree we'll at
5   some point deal with scheduling, that would be great.
6           THE COURT:  I'm sure that we will, and make sure
7   that my chambers are aware of the dates that you are
8   unavailable.
9           MR. SCHIFFMAN:  I will do that.  We'll send a
10  letter.  I think we've made a motion and we've had some
11  discussions with Mr. Kazin as well who has obviously been,
12  as always -- whether we disagree or not, on a personal
13  level has always been amenable to accommodating us
14  personally and I appreciate that.
15          THE COURT:  All right.  We'll take a look.
16          MR. SCHIFFMAN:  Thank you, Your Honor.
17          THE COURT:  Before we sign off, I just want to
18  make sure that Deloitte doesn't have any other issues that
19  it wants to raise while we've got everybody on the phone.
20          MR. SPRAGUE:  Yes, Your Honor, this is Bob
21  Sprague again.
22          In terms of the due date of the reports, I don't
23  think, given that, you know, we've got a couple documents
24  outstanding, that we will meet the December 19th deadline.
25  We've at this point started drafting the forensic side.

1   The valuation report, we're sort of holding off on until
2   we get the agreement.  So the 19th is probably not
3   realistic, given some of the internal processes we have to
4   go through to issue expert reports at Deloitte.  So --
5           THE COURT:  All right.  When do you want to
6   submit that report?
7           MR. SPRAGUE:  Your Honor, I think just given the
8   holidays as well coming up, I would expect that we
9   probably will not get it out by the end of the calendar
10  year and that a more realistic timeframe would be sometime
11  in January.
12          THE COURT:  That makes sense to me.  Do you want
13  to pick a day in January?
14          MR. SPRAGUE:  I would probably say the end of
15  January to be safe.
16          THE COURT:  Okay.
17          MR. SCHIFFMAN:  I'm sorry, what was the date?
18          THE COURT:  January 31.
19          MR. SCHIFFMAN:  If I thought my objection would
20  have any impact, I would object.
21          THE COURT:  I understand you don't like that.
22          MR. SCHIFFMAN:  Well, Your Honor, what happened
23  is we've now held a document back five days and somehow we
24  get a six week extension and it's my fault.
25          THE COURT:  Who said it was your fault?

1                MR. SCHIFFMAN:  Well, again, you know, maybe --
2     again, I don't know how we have a six week extension.
3     This is our second extension.  I mean -- all right.
4     Anyway, more calls to Newcastle.
5                THE COURT:  All right, look, you're trying to
6     put the trial off, so it seems like --
7                MR. SCHIFFMAN:  I'm not trying to put the trial
8     off.  In fact, I'm happy to try it in May.  I'm not trying
9     to put the trial off.  I was happy with the May date and I
10    want the May date.  And if we can go back to the May date,
11    Mr. Kazin and I are both okay with the May date.  I just
12    don't want the date in June that turns out to be my
13    vacation.  Other than that, I'm happy with May.
14               THE COURT:  Okay, just keep your voice low.  Be
15    calm.  If need be, we may be able to get back to May.
16    Even if it's a May trial date, the end of January, it
17    seems to me, is plenty of time for Deloitte to get that
18    report out in advance of trial.  So, January 31st is
19    fine --
20               MR. SCHIFFMAN:  Your Honor, just to remember,
21    again, not that it's going to change the Court's --
22               THE COURT:  Deloitte needs to be deposed, I
23    understand that, but it sounds to me like you're eager to
24    get it done so I don't think it will take too long after
25    they issue the report for you to find convenient dates to

```
 1    take the depositions you need.  All right?
 2             Anything else?
 3             MR. KAZIN:  Nothing from plaintiffs, Your Honor.
 4    Thank you.
 5             THE COURT:  All right.  Happy holidays,
 6    everybody.
 7             (Whereupon the above matter was adjourned at 1:20
 8    o'clock, p. m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

      I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

      /S/ Susan E. Catucci
      _____

      Susan E. Catucci, RMR
      Official Court Reporter
      915 Lafayette Boulevard
   Bridgeport, Connecticut  06604
        Tel: (917) 703-0761